Filed 9/10/25  P. v. Meurs CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DIRK VAN MEURS,<br><br>        Defendant and Appellant. | A169167<br><br>(Alameda County<br>Super. Ct. No. 19-CR-009439) |

Defendant Dirk Van Meurs appeals from a jury conviction of multiple sex offenses against a child.  On appeal, he asserts he received ineffective assistance of counsel because his attorney failed to object to the prosecutor's use of the word "rape" when questioning the victim.  He also contends, and the Attorney General agrees, the trial court incorrectly calculated his presentence custody credits.  We reject defendant's challenge to his conviction but agree he is entitled to additional credits.

BACKGROUND

*Prosecution's Evidence*

***Doe's Testimony***[1]

Doe was nine years old when her mother married defendant, who was a physician.  She and her mother and brother, C.T., moved into defendant's

_____

[1]  Doe was 35 years old at the time of trial.

1

home.  Defendant's two sons also lived in the home.  The following year, defendant and mother had a son, C.V.  Mother did not subsequently return to her work outside the home.

After the marriage, Doe noticed mother began "sleeping a lot." Defendant would give mother "some type of medicine" for headaches, and mother would be out for hours.  This would take place "at least every week. My mom would sleep all the time.  Like she would just sleep all the time."

Around the time Doe was 10 years old, defendant began to get "a little bit too touchy-feely" with her.  He would make comments about Doe, sexualizing her body.  "It felt like every day.  Anytime, like, my mom wasn't around."  She recalled defendant asking her, "when [they] went horseback riding," if she "had [her] cherry popped."

The comments escalated to touching, where defendant would make Doe kiss him "[w]ith tongue" "every day after school."  Defendant would rub Doe's chest and "rub his groin" on her when he kissed her.  "[A]ny time [she and defendant] were in the car by [them]selves," defendant "would like put his hand on [her] thigh and rub between [her] legs."  At first, Doe could keep her clothes on, but after a while, defendant began to tell her to unbutton her pants.  Defendant would then touch and insert his fingers into Doe's vagina.

Doe was able to recall several specific incidents.  In one, when Doe was around 10 or 11 years old, mother walked into Doe's room while defendant "was leaning on top of [her].  And [she] was leaning back on the bed.  And he was trying to kiss me, but [Doe] was like moving away.  He was like being very persistent by being on top of [her]."  Doe remembered feeling defendant "rubbing up" against her body, rubbing her thigh, leg, and chest with his hand.  She could feel his erect penis through his pants.  Upon seeing defendant on top of Doe, mother "screamed, 'What the fuck are you doing?' "

Defendant "jumped up" and "moved back." "[Defendant] said he was tickling [Doe]." The victim and mother did not speak of the incident.

On her 12th birthday, while mother was gone to pick up Doe's birthday cake, Doe "was getting ready to . . . shower" when defendant came into the bathroom and "leaned [Doe] against the wall where the towels would hang, and he started touching [her] in [her] vagina using his finger." When asked how many times defendant had touched her vagina before her 12th birthday, Doe stated, "it happened frequently . . . it was more than a hundred times." Doe would tell defendant "no," but she "would always just give in because it was easier to give in." Doe did not recall defendant explicitly telling her not to tell anyone. She stated, "Words didn't get attached to [it all] until things escalated."

When she was 12 or 13 years old, Doe recalled defendant sitting next to her and putting "on a porn tape." He would then take his "pants down, and he put [her] hand on his penis." Around the same time, when Doe was a freshman in high school, the abuse "started to change." "It went from touching and kissing to him using his mouth on my vagina." After the first time he performed oral sex on Doe, the abuse "moved from him wanting to kiss me all the time to him wanting to perform that on me all the time." This would happen "[v]ery, very often," about one time per week.

When Doe was 14 years old, the abuse "progressed" again, and "went from [defendant] wanting to put his mouth on [Doe's] vagina to actually inserting himself inside of [her]." Defendant would "frequently" make "sexual comments," telling Doe he had had "dreams" about her, telling her sex "would just be something between [them]," and that it would, "like, bond [them] for life." The first time defendant had sex with Doe it was in defendant and mother's bedroom. Defendant undressed Doe, and after he

3

"licked [her] vagina," he "put his penis inside of [her]." Doe recalled defendant "grunting" and telling her "to relax."

Around that time, defendant bought a camper van and kept it in a storage facility. Once he had access to the camper van, the abuse "mainly took place in there." Doe recalled defendant telling her not to tell mother about this incident because it would "ruin the family dynamic and everything." Doe described the abuse as "a continual thing." But she was unable to recall many specific instances because she began "blacking out every time it happened. [She] would just put [her]self in another world and wait for it to be over." Nevertheless, she estimated the abuse in the camper van occurred every other week, if not every week.

When she was 14 or 15 years old, Doe started receiving birth control shots at the clinic where defendant worked, at defendant's direction. Defendant "told [Doe] to get the birth control shot" so mother would not know she was on birth control. Defendant took her to her first appointment, without mother's knowledge.

In 2004, defendant took Doe and C.V., who was five or six years old at the time, to the camper van. Before getting there, defendant gave C.V. cough syrup and he fell asleep in the back seat of the car. When they got to the storage area, Doe refused to get out and go to the camper. When she said, " 'No.' [¶] [Defendant] got mad. And [she], like, was standing on, 'No.' " Her brother's presence compelled her to stay in the car and she thought defendant "only stopped because . . . [C.V.] kind of stirred and woke up."

In retaliation, defendant took away concert tickets Doe had for an upcoming show. Doe protested stating, " 'You're not taking my fucking tickets.' [A]nd he got so mad and frustrated that he used his arm and slammed me against the side of the door. And my head hit the car seat—the

4

seatbelt, I'm sorry. He had me kind of like smashed up. And he's going, 'You're not going to the concert.' And I kind of like pushed him and was swinging to go get him off of me." Doe told defendant she was going to tell mother, and he said, " 'You're not telling your mom.' "

Doe did, however, tell her mother that defendant " 'said if I don't have sex with him, he's not going to give me my concert tickets.' " Defendant denied saying any such thing, and he and mother started arguing. Mother did not contact the police.

Days later, defendant called Doe and pleaded with her to remedy the tension her accusation had caused in the house. He told Doe to "just tell [mother] you made the whole thing up. You'll get your tickets back. . . . [H]e basically forced me into writing my mom a letter and saying I made it up."

The abuse stopped after this incident. But things also changed between Doe and mother. They would get into arguments where Doe would call mother "the B-word," tell mother she "hated her," and scream at her. In her senior year of high school, Doe moved into her friend's aunt's house and lived there for about a year.

Doe later told C.T. about what defendant had done to her, but she could not recall the specifics of what she shared. And once while arguing with her younger brother C.V., she said, " 'Your dad is a pedophile.' " C.V. was "shocked and appalled" by the statement, but Doe did not give further details. C.V. told defendant about the victim's comment, and defendant later approached Doe, pleading, " "Please don't say anything. You know, you can go to therapy because if you say something, I'll go to jail.' "

In January 2019, mother asked Doe why she was not speaking to defendant and about her anger towards him. Although Doe initially refused to speak, mother persisted, and Doe "just broke down." Doe told mother

defendant had "molested and raped [her]" in middle school and high school. Mother was "visibly mad, to the point where [Doe was] kind of scared for her to drive home."

At this point, Doe decided to go to the police. Mother, in turn, confronted defendant, and Doe recalled defendant "trying to convince [mother] to get me to not go to the police. He was trying to convince her to get me to not go," he said, "like, just wait until the house is sold." Doe refrained from going to the police for a few months, but she decided she could not wait any longer because defendant would " 'keep[] manipulating [her] like he always does.' "

In a pretext call, Doe and mother called defendant. Mother told defendant, "in order for [Doe] not to go to the police, he needed to apologize. And he did. And on the call, he got on the phone with [Doe] and he apologized for doing what he did and he was saying he was sorry for all that he did to [Doe]."

### C.T.'s Testimony

C.T. was seven years old when mother and defendant married. He remembered instances of defendant's favorable treatment toward Doe. For example, if mother took Doe's phone away, defendant "would go behind my mom's back, slide [Doe] the phone, for whatever reason I don't know. And when that would happen to me, I would have to stick it out."

When he was 13 or 14 years old, Doe told him, defendant "tried to have sex with her. She said it was in the camper." He was "shocked; but at the same time, [he] wasn't, just because of several things you play back in your mind that you see. [C.T.] was angry but—you know, angry, surprised. But at the same time [he] wasn't." He recalled "a lot of times; [he] would walk in on [defendant and Doe]. They would be—like, my sister would be in a corner

6

kind of backed up against a corner, and [defendant] would be standing over her, you know with—with both hands, you know, towering over her."

One time, mother asked him what Doe had told him about defendant. When C.T. told mother, she "was pissed." Defendant, who was in the room, denied what Doe said. C.T. also told his therapist, who reported the abuse to the authorities. He remembered "some lady came out to the house, looked at the rooms, and that was that. And the next time I went to my therapist the next week, he said nothing was going to come of it." C.T. did not know if mother ever called the police.

### *Mother's Testimony*

Mother testified that when she met defendant, she thought he was "really, really nice. He was good to my kids. . . . We did things together. We even went camping, I think, together before we got married. So it was fun. It was nice." When Mother had her youngest son, C.V., she became a stay-at-home mom, while defendant worked as a doctor.

Mother remembered walking in on defendant once, "[defendant] was on top of [Doe], and [Doe] was laying back with her legs up and feet and arms up, pushing him off her. [¶] And [she] asked, 'What the hell are you doing?' And he jumped up at that point." Defendant asserted they were " 'just wrestling,' " and mother replied, " '[Y]ou don't frickin' wrestle with my daughter.' " When they married, defendant and mother agreed to treat their children the same except, "[t]he only thing we couldn't do was touch—he couldn't touch my kids. . . . I could never put my hands on his kids; he could never put his hands on my kids." She did not recall ever giving Doe or defendant permission for Doe to start on birth control. Mother also recalled Doe once told the family therapist defendant " 'touched me.' " The therapist

contacted child protective services, who was unable to do anything because "they said that there was nothing definite."

In late 2018, mother noticed Doe "acting, like, really kind of mean, being really curt towards [defendant]." She first approached defendant and asked why Doe might be acting in such a way, and he said, " 'I don't know. Nothing has happened.' " A few weeks later, mother asked Doe. Doe told her defendant "raped her and molested her. And so I started crying; she's crying. And I asked her, 'When did this happen?' [¶] And she said, 'All the time.' She says—I think she was about 10."

Later, mother met with defendant at a nearby school. She told him she just needed him " 'to tell me the truth.' " She had already spoken to Doe, who said he " 'raped her and that [he] molested her and [he was] touching her, and it's been going on since she was 10.' " Defendant said, " 'Yes.' " Mother remembered saying, " 'But you're a doctor. She's a kid. She's 10 years old when this was happening.' [¶] And he said, 'But I stopped like 15 years ago.' [¶] And then [she] asked him where it happened. And he said he went to the camper . . . [Doe] would lay down on the bed and—and he took her pants off." Mother asked if defendant had oral sex, and defendant replied, " 'Well, she didn't like that.' "

After confronting defendant, mother walked in on C.V. screaming at defendant. C.V. was saying "something about, 'How could you? How could you?' [¶] And I came downstairs. And I said, 'What happened?' [¶] And [defendant] said 'I told [C.V.]' " C.V. was crying and upset, and he stated, " 'He did this. How could you do this to my sister.' "

Mother then told defendant Doe was going to go to the police and asked that he " 'just admit it and get it over with.' [¶] And he said, 'I will do that, but I need to find me a lawyer.' "

8

In 2019, mother went with Doe to the police station and gave an interview. Later at home, mother discovered a letter from defendant to Doe apologizing "for what he had done." Mother recognized defendant's handwriting and recalled he had planned on writing an apology letter to Doe. The letter, in part, read " 'I am so sorry about the anguish and anger that I have caused you and you feel toward me. I have felt so ashamed of how I treated you when you were an early teenager.' "

### C.V.'s Testimony

In January 2019, C.V. was on break from college, when he heard defendant and mother "arguing. But it was different. I never heard my mom scream like this, so that caught my attention to something is up." C.V. found defendant in the family room and asked if he was ok. Defendant replied, " 'No.' " C.V. described defendant's demeanor as "very guilty. Just guilty, like he got caught doing something, you know, he shouldn't have been doing." Defendant then told C.V., " 'I understand if, you know, you want nothing to do with me after this.' " Defendant continued, " 'For years now, [Doe] and I used to have a sexual relationship.' " Defendant said, " 'I'm so sorry, [C.V.]' " C.V. "fell to [his] knees, and [he] started bawling, screaming. [He] was like no, this can't be real. . . . This is a nightmare. There is no way this is happening." Mother then ran into the room, and when she saw defendant and C.V. on the floor, she "put two and two together. She's like, 'You told him?' " Defendant and mother continued fighting, and defendant eventually left the house for a few hours.

Before returning to college, C.V. and defendant had "quite a few" conversations about what defendant had done. "Some of them were just [him] like asking, Why, why—you know, like why did you do it. And, you know, the response was always something along the lines of, you know, I was

9

stupid; or you know, oh, I would take it back in a heartbeat if I could." C.V. remembered defendant repeating a phrase, " 'I'd be far more useful to the family and to [Doe] out of jail than if I was in jail. [¶] . . . [¶] 'If I'm working again, I can provide for [Doe], you know, rent, you know, pay bills, whatever the case may be.' " The only details defendant provided C.V. were that the abuse happened multiple times in the family's camper, starting when Doe was 11 years old.[2]

### *Defense Evidence*

Before his arrest, defendant worked as an internal medicine and family practice doctor for over 40 years. As such, he was a mandated reporter and had made many reports to child protective services.

Defendant generally denied all of the allegations against him: "They're all fallacious" and it "never happened." He also claimed he had been diagnosed with a psychiatric condition called conflict avoidant posttraumatic stress disorder in 1993, a diagnosis which he maintained was confirmed by two psychologists in 2019 although he could not recall the names of the doctors and did not produce any medical records of any diagnoses, visits, or treatments. The condition caused him to "black out," leaving him with no memory of his words, actions, or thoughts for periods of time. He asserted this condition caused gaps in his memory about his confessions to C.V., conversations with mother, and his interactions with Doe.

When asked about specific incidents, defendant could recall parts but not all of the events. For example, he denied the incident where mother walked in on him on top of Doe but testified, "I can't tell you what did happen

---

[2] The prosecution also presented expert testimony by Dr. Blake Carmichael on Child Sexual Abuse Accommodation Syndrome (CSAAS), explaining common misconceptions about child sexual abuse and trauma, and how abused children may react to and report such crimes.

10

instead of that, but it didn't happen." He did recall, in 2019, when mother confronted him about the abuse allegations. He remembered mother wanting to know if he had molested Doe, and that he responded affirmatively. He then recalled driving back home, turning off the car, and entering the house, but he could not remember much of the rest of the evening.

Defendant recalled C.V. asking if everything was okay but he could not recall the remainder of the conversation. He described himself as being in a "conflict-avoidance mindset, and [he didn't] really recall exactly, you know, where [he] sat, what [he] did, even what [he] said. [He] just [didn't] know." He was unable to recall whether he told C.V. he had a sexual relationship with Doe. He remembered the household was "on edge" for the rest of the week, because Doe "had made those accusations."

Defendant stated he wrote the letter to Doe to apologize "for the fact that [Doe] felt that badly towards me." Part of the letter read, " 'I somehow did not realize that my behavior towards you was upsetting. I clearly should have.' " When asked to clarify what behavior the letter was referring to, defendant replied, "I'm not sure that I recall the details of what that was referring to," "this was years ago."

Although he remembered a 2019 call between himself and Doe, he could not recall any details about who was present on the call or what was said during the call.

*Jury Verdict and Sentence*

Defendant eventually went to trial on a third amended information, charging defendant with 11 counts of various forms of child sexual abuse and rape, and multiple enhancements and aggravating factors.[3] After two days of

---

[3] The Alameda County District Attorney filed a third amended information alleging the following: forcible lewd act on a child under 14 years

11

deliberations, the jury found defendant guilty on all counts. The court found true the special circumstances and aggravating factors and imposed an aggregate term of 116 years to life, consisting of an upper eight-year term for counts 1, 6, 7, and 9–12, and a sentence of 15 years to life for counts 2–5. The minute order for the sentencing hearing stated defendant had "been in custody for 1600 actual days" but did not provide for any conduct credit.

In pronouncing sentence, the court stated, "You were brought into the victim's life to serve as a source of safety and protection. Instead, you used that position of trust to bring terror to a young girl and destroy an entire family in the process. [¶] The fact that you are a licensed medical doctor who took an oath to treat and heal patients makes this case all the more disturbing. However, seeing how little taking an oath means to you, shown

---

old (Pen. Code, § 288, subd. (b)(1)—count 1); aggravated sexual assault of a child under 14 years old—forcible penetration (*id.*, §§ 289, subd. (a), 269, subd. (a)(5)—count 2); aggravated sexual assault of a child under 14 years old (*id.*, §§ 289, subd. (a), 269, subd. (a)(5)—counts 3 & 4); aggravated sexual assault of a child– oral copulation under 14 years old (*id.*, § 269, subd. (a)(4)—count 5); forcible sexual penetration on a minor under 14 years old (*id.*, § 289, subd. (a)(1)—count 6); forcible oral copulation on a minor over 14 years old (*id.*, former § 288a, subd. (c)(2)—counts 7 & 9); forcible rape (*id.*, § 261, subd. (a)(2)—counts 10–12). (The amended information did not include what had been formerly charged as count 8.) The information further alleged as to each that the offenses occurred against the same victim, on separate occasions. (*Id.*, § 667.6, subds (c)–(d).) Additionally, four circumstances in aggravation were alleged for each count: (1) the victim was particularly vulnerable (*id.*, § 1170, subd. (b); Cal. Rules of Court, rule 4.421(a)(3)); (2) the manner in which the crime was carried out indicates planning, sophistication, and professionalism (Pen. Code, § 1170, subd. (b); Cal. Rules of Court, rule 4.421(a)(8)); (3) the defendant took advantage of a position of trust or confidence to commit the offense (Pen. Code, § 1170, subd. (b); Cal. Rules of Court, rule 4.421(a)(11)); and (4) the defendant has engaged in violent conduct that indicates a serious danger to society (Pen. Code, § 1170, subd. (b); Cal. Rules of Court, rule 4.421(b)(1)).

by your testimony in this case, it is not surprising. What made the guilty verdict inevitable in this case was your unmitigated guilt."

DISCUSSION

### *Ineffective Assistance of Counsel*

Defendant asserts he received ineffective assistance of counsel when his attorney failed to object to the prosecution's use of the word "rape" when questioning Doe. He maintains the prosecutor "strayed into eliciting testimony" from Doe which "assumed the ultimate issue" (italics omitted) of "rape." He points to the following examples:

> "[Prosecutor]: Going back to that time, the first time that the defendant raped you, you said that you were in the bedroom. Did you undress yourself? Did the defendant undress you?
>
> "[Doe]: I believe he undressed me. And I kind of just—like I said, I obliged just to. . . . [¶] . . . [¶]
>
> "[Prosecutor]: What happened after he undressed you? [¶] . . . [¶]
>
> "[Doe]: . . . [H]e put his penis inside of me. [¶] . . . [¶]
>
> "[Prosecutor]: What happened after he raped you?
>
> "[Doe]: I got up and went and took a shower. Just tried to block it out. [¶] . . . [¶]
>
> "[Prosecution]: Did he ever rape you again?
>
> "[Doe]: It was a continual thing, yeah.
>
> "[Prosecutor]: And this is still your freshman year of high school?
>
> "[Doe]: Yes.
>
> "[Prosecutor]: Do you remember the next time he raped you?
>
> "[Doe]: I think—not really. Like I'll be honest, I just started blacking out every time it happened. I would just put myself in another world and wait for it to be over."

13

Defendant acknowledges the prosecution could, of course, ask Doe questions to elicit testimony that defendant committed the charged acts. But he insists the questions asked here show "the prosecutor asked questions assuming multiple rapes had already occurred, thereby eliciting testimony that amounted to a confirmed opinion that [he] was guilty of rape." Since this type of testimony is " ' tantamount to expressing an opinion as to [his] guilt," it was, according to defendant, "objectively unreasonable for [his] trial counsel not to object." He further asserts counsel's failure to object was prejudicial because Doe blocked out memory of many of the events, there was very little testimony about the force, duress, or fear necessary to establish the forcible rapes counts (counts 10–12), and it was therefore "the prosecutor's questions assuming rape that likely established for the jury that all elements of all three rape charges" had been proven.

A criminal defendant has the right to effective assistance of counsel under both the state and federal constitutions. (*People v. Breslin* (2012) 205 Cal.App.4th 1409, 1418 [citing constitutional provisions and cases].) To succeed on an ineffective assistance of counsel (IAC) claim, a defendant must show (1) counsel provided representation that fell below an objective standard of reasonableness under prevailing professional norms and (2) prejudice resulted from counsel's deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 691–692 (*Strickland*); *People v. Jennings* (1991) 53 Cal.3d 334, 357 (*Jennings*).)

Defendant has met neither prong.

When a defendant makes an IAC claim on direct appeal and the record does not show why counsel chose to act as he or she did, the conviction must be affirmed unless there was no rational tactical purpose for counsel's acts or omissions. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007.)

There being no explanation in the record for why defense counsel did not object here, defendant maintains "it was objectively unreasonable for [his] trial counsel not to object." Not so. His counsel could well have decided not to bring further attention to the prosecutor's use of the word "rape," or to quibble over the prosecutor's use of the word in questioning Doe. (See *People v. Lopez* (2008) 42 Cal.4th 960, 972 [" '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' "]; *People v. Riel* (2000) 22 Cal.4th 1153, 1197 ["competent counsel may often choose to forgo even a valid objection. '[I]n the heat of trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' "].)

Moreover, while the term "rape" is a term with legal and technical meaning, it is also a term commonly used in everyday vernacular. Thus, while lay witnesses must ordinarily testify to facts, leaving the drawing of conclusions and opinions to the factfinder (*People v. Williams* (1992) 3 Cal.App.4th 1326, 1332, disapproved on another ground as stated in *People v. Randolph* (2018) 28 Cal.App.5th 602, 613–614), usage of the term "rape" is not necessarily tantamount to expressing an opinion on defendant's guilt. (See *State v. Goss* (1977) 293 N.C. 147, 154 [witness's use of the term " 'rape' " "was clearly a convenient shorthand term, amply defined by the balance of her testimony"].)

Other factors that may bear on whether use of the word "rape" during a trial constitutes the expression of an impermissible legal opinion include whether the term is introduced by the witness or in questions by counsel; whether the term is used on direct, cross, or redirect examination to impeach or refute testimony; whether the witness describes the meaning of the term;

15

and whether the jury is admonished or instructed regarding the witness's use of the term in a colloquial rather than legal way. (See *People v. Callahan* (1999) 74 Cal.App.4th 356, 380 [allowing "opinion" when witness could not adequately describe her observations without using such language].) Here, while the term was introduced by the prosecution during her examination of Doe, Doe first described defendant's actions in detail, i.e., as "actually inserting himself inside of [her]." She also clarified that she meant he would "have sex with [her]." This testimony was immediately followed by testimony of when defendant would have sex with her, he told her sex would "bond[] [them] for life" and warned not to tell mother "because this could, like, ruin stuff, ruin the family dynamic and everything." In short, it is clear this testimony set the stage4 for the use of the term "rape." (See *People v. Hurlic* (1971) 14 Cal.App.3d 122, 127 [Evidence Code section 800 "merely requires that witnesses express themselves at the lowest possible level of abstraction. [Citation.] Whenever feasible 'concluding' should be left to the jury."].)

And, although the court did not admonish the jury regarding the colloquial usage of the term (because defendant made no such request), the trial court did instruct the jury that nothing the attorneys said, either during opening statement or closing argument or their questioning, was evidence. The court instructed, "Evidence is the sworn testimony of the witnesses. . . . Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discussed the case, but their remarks are not evidence; their questions are not evidence. Only the witnesses' answers are evidence. [¶] The attorneys' questions are significant only if they help you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." Defense counsel also reiterated this instruction in his closing

16

argument stating, "[T]he other tenet in the case that I want to remind you of is that you should your decisions on the evidence. You heard the Judge tell you. . . . 'You must decide what the facts are in this case. You must use only the evidence that is presented in the courtroom.' And it goes on to say, 'Nothing the attorneys say is evidence.' "

This situation is nothing like those presented in *People v. Duong* (2020) 10 Cal.5th 36 (*Duong*) and *People v. Clotfelter* (2021) 65 Cal.App.5th 30 (*Clotfelter*), cases defendant cites in his reply brief.

In *Duong*, the defendant was convicted of four counts of murder. (*Duong, supra*, 10 Cal.5th at p. 42.) On appeal, the defendant challenged, among other things, the trial court's exclusion of testimony by his defense expert who had "concluded he 'believes beyond a reasonable doubt that the shooting of [one victim] was purposeful and intentional,' while the shooting of the other three victims was 'unintentional and accidental . . . beyond a reasonable doubt.' " (*Id.* at p. 57.) After holding an evidentiary hearing, the court ruled the expert's opinion as to the defendant's intent would improperly invade the province of the jury, the trier of fact. (*Id.* at p. 59.) The Court of Appeal affirmed, stating the testimony was " 'tantamount to expressing an opinion as to defendant's guilt' [citation] because it proposed to dispose of an essential element of the crime. In essence, [the expert] sought to testify that defendant was not guilty of three murders because [the] defendant lacked the required intent." (*Id.* at p. 61.)

In *Clotfelter*, the defendant was convicted of several offenses involving inappropriate behavior with 14 or 15-year-old boys. (*Clotfelter, supra*, 65 Cal.App.5th at p. 37.) Although the defendant had undisputedly developed close connections with the boys, there was a dearth of evidence that he had acted inappropriately, and the dispositive issue was the

17

defendant's intent.  (*Id.* at p. 60.)  The defendant denied any wrongdoing, the boys testified the defendant never did anything inappropriate, and the parents of the boys testified they never saw any concerning behavior between the boys and the defendant.  (*Id.* at pp. 39, 42–43, 64–65.)  The prosecution called several witnesses, including an expert who testified the defendant's " 'current criminal behavior' was consistent with his history of sexual offending," that her " 'opinion with reasonable medical certainty is' " that his "current behavior was consistent with his history of grooming for the purposes of sexual molestation," and that the defendant " 'continue[d] to experience sexual interest in prepubescent boys.' "  (*Id.* at p. 57, italics omitted.)  On appeal, defendant claimed ineffective assistance of counsel based on his counsel's failure to object to inadmissible and prejudicial testimony.  (*Id.* at p. 54.)  The appellate court agreed, explaining "the focus of the trial was on [the defendant's] intent, i.e., were his interaction with [one boy] 'motivated by an . . . abnormal sexual interest' [citation] and were his communications with [two other boys] motivated by a specific 'intent to commit' a lewd or lascivious act [citations], this testimony was tantamount to telling the jury that [the defendant] was guilty of the charged offenses."  (*Id.* at p. 58.)  This testimony, continued the court, "squarely violates [Penal Code] section 29," as the expert "offered an opinion as to whether [the defendant] had a particular mental state at the time he committed the charged offenses" and counsel erred by failing to object.  (*Ibid.*)

Here, in contrast, we are not presented with expert testimony; rather we are presented with the victim's lay testimony as a percipient witness and the victim's responses to the prosecutor's questions.  While defendant contends the purported opinion testimony by Doe was "much more prejudicial" than the expert testimony in *Clotfelter*, because "the expert's

18

opinion was simply an opinion from a hired expert that the jury could freely disregard," as the court observed in *Clotfelter*, an "expert's statements are 'likely to carry special weight with the jury.'" (*Clotfelter, supra*, 65 Cal.App.5th at p. 61.) In any case, the jury is free to believe or disbelieve any witnesses' testimony, and as we have noted, was instructed not to regard the attorneys' questions as evidence.

Defendant also contends that by asking Doe if "she had been raped, the prosecutor finessed the critical issue of whether the sexual intercourse had been obtained through force, violence, or duress." However, as the evidence shows, Doe's prior detailed description of defendant's acts formed the basis for the prosecutor's subsequent shorthand use of the term "rape." Further, the jury was properly instructed on the elements of rape, and defendant points to nothing to suggest the prosecutor urged that those elements were proven by any conclusory reference to "rape" during testimony. Indeed, the prosecutor reiterated the elements of rape and the evidence of those elements during her closing argument, including evidence of duress.

In any case, defendant has not shown prejudice—that is, he has not shown that there is a reasonable probability that, but for counsel's assertedly deficient representation, the result would have been different. (*Jennings, supra*, 53 Cal.3d at p. 357.) "'"A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*People v. Avena* (1996) 13 Cal.4th 394, 418.)

Defendant was convicted of three counts of rape (counts 10–12). A rape conviction under Penal Code section 261, subdivision (a)(2), requires proof the rape was "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." "'Duress' means a direct or implied threat of force,

19

violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and the victim's relationship to the defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b)(1).)

Although defendant contends "the evidence supporting the force, violence, duress, menace, or fear of immediate bodily injury element was weak," the record demonstrably shows otherwise. Defendant was Doe's stepfather. The abuse began when Doe was very young, 10 years old, and continued for years. He was the sole wage earner in the household. He was physically imposing, and although the rapes occurred when Doe was a few years older, when she was 11 years old, defendant was "6 feet maybe" "200 pounds" versus Doe's "5'5, maybe 5'6" "120." Defendant told Doe sex would "bond[]" them for life and that sex was "a just-us thing, like a bonding us." He also threatened her not to tell mother about the abuse because it would "ruin the family dynamic and everything." He told her "how fragile [mother] was, like how fragile her mental" state was, and Doe stated she was "afraid of what—the effect" finding about the abuse would have on mother. In addition, defendant isolated Doe for much of the abuse, taking her to the camper van outside of the family's home where Doe was completely helpless, and they would not be discovered. (See *People v. Cochran* (2002) 103 Cal.App.4th 8, 16 [evidence of duress given age and size difference between the defendant and the nine-year-old victim, their father-daughter relationship, and the implicit threat the victim would break up the family if she did not comply], disapproved of on another ground as stated in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12; *People v. Senior* (1992) 3 Cal.App.4th 765, 775

[evidence of duress given father-daughter relationship, the defendant threated to hit the 14-year-old victim, and he told her if she did not submit it would result in divorce, thus jeopardizing the family unit].)

In short, the evidence supporting the rape convictions is overwhelming. (See *People v. Avena, supra,* 13 Cal.4th at p. 423 [no prejudice apparent on facts of case, given that evidence of defendant's guilt was overwhelming]; *People v. Winn* (2020) 44 Cal.App.5th 859, 868 [no prejudice because there was no reasonable likelihood the jury would have reached a more favorable outcome].)[4]

***Sentencing***

Presentence credit consists of actual (Pen. Code, § 2900.5) and conduct credits (*id.*, § 2933.1). Sentencing courts are therefore required to calculate a defendant's total presentence credits by taking into account both the defendant's actual and conduct credits. (*Id.*, § 2900.5 subd. (d).)

A defendant sentenced to state prison is entitled to credit for "all days" spent in custody prior to sentencing (actual credits), and when a defendant is convicted of one or more violent felonies, he or she is entitled to additional credit calculated at 15 percent of his or her actual credits (conduct credits). (Pen. Code, §§ 2900.5, subd. (a), 2933.1, subd. (c), 4019.)

Here, although the trial court awarded defendant 1,600 days of actual credit, it did not award him any conduct credit. Thus, the parties are correct that the abstract of judgment and the clerk's minutes must be modified to reflect that defendant is also awarded 240 days of presentence conduct credit, for a total of 1,841 days of presentence credit.

---

[4] Defendant also raised, but subsequently withdrew, an argument that his counsel was ineffective in failing to assert spousal privilege to preclude certain testimony by mother. We therefore have not considered the issue further.

21

The Attorney General also notes the oral pronouncement of the sentence differs from the sentence reflected on the abstract of judgment. The trial court sentenced defendant to an aggregate term of 116 years to life, consisting of seven, eight-year terms for counts 1, 6, 7, 9–12 and four terms of 15 years to life for counts 2–5 to be "served fully, separately, and consecutively." However, the court's minute order and the determinate felony abstract of judgment show concurrent terms for counts 1, 6, 7, 9–12. "When there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Walz* (2008) 160 Cal.App.4th 1364, 1367, fn. 3.)

We will therefore also order the trial court to correct this discrepancy on remand. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate courts may correct clerical errors at any time, and order correction of abstracts of judgment inconsistent with oral judgments of sentence].)

## DISPOSITION

The matter is remanded and the trial court or clerk of the court is directed to correct the indeterminate and determinate abstracts of judgment and clerk's minute order to reflect, in accordance with this opinion, a total of 1,841 presentence credits and to correct the clerk's minute order and the determinate abstract of judgment to reflect consecutive sentences for counts 1, 6, 7, 9, 10, 11, and 12. In all other respects, the judgment is affirmed.

_____

Banke, Acting P. J.


We concur:


_____

Langhorne Wilson, J.


_____

Smiley, J.


A169167, People v. Van Meurs

23